UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GARY S. CANNS,

                 Plaintiff,

          v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                 Defendant.

09 Civ. 1294 (PGG)

**MEMORANDUM OPINION & ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

        Gary S. Canns brings this action pursuant to 42 U.S.C § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying his application for Social Security Disability ("SSD") and Supplemental Security Income ("SSI") benefits.  Both Canns and the Commissioner have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons set forth below, Canns's motion is DENIED, and the Commissioner's motion is GRANTED.

## BACKGROUND

        On September 11, 2003, Canns filed an application for SSD and SSI benefits, alleging an inability to work as of December 1, 2002.  (R. 86-88)  On February 10, 2004, the Social Security Administration denied his application.  (R. 39-42)  Canns then requested a hearing before an Administrative Law Judge.  (R. 44)  A hearing was held on April 6, 2007, before Administrative Law Judge Owen Katzman (the "ALJ").  (R. 692)  Canns was represented by counsel at the hearing.  (R. 692-95)

        On April 16, 2007, the ALJ issued a decision finding that Canns is not disabled under Sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act and denying his

application for SSD and SSI benefits.  (R. 19-28)  Canns sought relief from the Appeals Council,

but the Council denied his request for review on December 15, 2008.  (R. 6-8)

Canns filed this action pursuant to 42 U.S.C § 405(g) on February 13, 2009.  (Dkt.

No. 1)  Canns claims that he has been entitled to receive SSD and SSI benefits since December

1, 2002, because of disability and inability to work caused by renal cancer, emphysema, right

ankle fracture, and arthritic pain and fatigue.  (Cmplt. ¶¶ 4, 6)

I.      CANNS'S PERSONAL AND VOCATIONAL HISTORY

Canns was born on March 4, 1951.  (R. 86)  He earned a GED and completed two

years of college.  (R. 104, 696)  At the time of the hearing before the ALJ, Canns reported that he

lived alone, although he had earlier indicated he lived in a shelter.  (R. 115, 701)  Canns is able

to tend to his personal needs, to engage in household tasks such as cleaning and doing laundry, to

use public transportation, and to go shopping for groceries and other items on his own.  (R. 117-

119, 701-02)  Canns also handles his own finances and engages in daily social activities.  (R.

119)  He enjoys reading and does so on a daily basis.  (Id.)

Canns worked as a computer programmer from January 1986 to March 1996.  (R.

99, 107)  Between March and December 1996, Canns reports being employed as a Staff Officer

for the United States Army.  (R. 99, 107)  For one year beginning in July 1998, Canns worked as

a computer instructor for CompUSA.  (R. 99, 107, 109)  After leaving CompUSA, Canns worked

as an administrative assistant, receiving placements through a temp agency until December of

2001.  (R. 99, 107-08)  Canns was unemployed for a period of time before the onset of his

alleged disability.  (R. 703)  During this time, he looked for employment and took advantage of a

computer training program.  (Id.)

II.     **CANNS'S MEDICAL HISTORY**

    A.     **Physical Condition**

On June 26, 2002, Canns was contacted by the Veterans Administration.  (R. 468)
He agreed to accept medical treatment at the New York Veterans Affairs Medical Center (the
"VAMC").  (Id.)

On July 8, 2002, Canns received a physical examination at the VAMC.  (R. 465)
The notes from that examination indicate that Canns complained of rectal bleeding.  (Id.)  Canns
had been previously treated for hemorrhoids and had fractured his right foot in 1993 while in the
Army Reserves.  (Id.)  On the advice of a gastroenterologist, Canns underwent a colonoscopy on
October 2, 2002.  (R. 458, 460)

On October 15, 2002, Canns returned to the VAMC and saw Dr. Ruth Ellen
Pearlman.  Dr. Pearlman noted that a CT scan revealed a renal mass and ordered an additional
scan.  (R. 451-53)  Dr. Pearlman's notes from the visit also indicate that Canns complained of
"occasional" right ankle pain precipitated by changes in weather and strenuous exercise and
relieved with over the counter medications.  (R. 451-52)  Dr. Pearlman also noted that Canns did
not require these medications "very often."  (R. 452)

On November 19, 2002, after undergoing several tests at the VAMC, Canns was
diagnosed with necrotic renal cell carcinoma on his left kidney.  (R. 448-50)  On December 9,
2002, Canns underwent a left radical nephrectomy.[1]  (R. 423-24)  After the surgery, Canns
complained of soreness in the abdomen and "mild" tenderness at the incision site; he was given
morphine for his pain.  (R. 411-12)  Dr. Darren Freedman recommended that Canns undergo

---

[1]  Nephrectomy is defined as the "surgical excision of a kidney."  Dorland's Illustrated Medical
Dictionary 1259 (31st ed. 2007).

physical therapy four to five times a week for two weeks after his discharge.  (R. 405)  Canns

was discharged from the VAMC on December 12, 2002.  (R. 402)

On February 25, 2003, Dr. Pearlman saw Canns again.  (R. 387)  Her notes from

that visit indicate that Canns had "been doing well since the operation" but was "sleeping more

hours at night."  (Id.)  Dr. Pearlman also indicated that Canns complained of "generalized

itching."  (Id.)  At the time of this visit, Canns suffered from no cardiovascular symptoms, was

not affected by shortness of breath or cough, and had a "good exercise tolerance."  (R. 388)  Dr.

Pearlman noted that he was "recovering well" from his surgery but still suffered from fatigue.

(R. 389)   Dr. Pearlman referred Canns for a surgical consultation with regard to his hemorrhoids

and for an orthopedic consultation with regard to his right ankle pain.  (Id.)

Canns returned to see Dr. Pearlman on May 27, 2003.  He reported that he

"continue[d] to feel tired."  (R. 385)  Dr. Pearlman's notes reiterate her view that Canns was

"recovering well" after his surgery except for his ongoing fatigue.  (R. 386)

Canns saw Dr. David Chang, an orthopedist, on June 4, 2003.  (R. 384)  Canns

reported "mild" right ankle pain that was worse with rain or walking uphill.  (Id.)  Dr. Chang

indicated that that Canns's pain was "sharp on medial aspect of ankle/distal tibia" but noted that

Canns could walk without an "assistive device."  (Id.)  Dr. Chang diagnosed probable post-

traumatic arthritis in the right ankle and recommended that x-rays be taken.  (R. 385)

On June 17, 2003, nurse practitioner Tanish Mojica saw Canns, noting that he

"feels well" and that while he complained of "persistent fatigue," it was "getting better."  (R.

381)  Canns reiterated that his fatigue was "improving" when he saw Mojica again on July 22,

2003.  (R. 375)

4

On August 20, 2003, Canns was seen by Dr. Sarah Pettrone in the VAMC Orthopedic Clinic. (R. 361) Dr. Pettrone noted that Canns complained of "an acceptable level of pain" in his right ankle. (Id.) Canns told Dr. Pettrone that his pain increased with "prolonged walking or rainy weather" but said that he was not taking any medicine for the pain. (Id.) Dr. Pettrone diagnosed post-traumatic arthritis and recommended use of non-steroidal anti-inflammatory drugs. (R. 362)

On August 28, 2003, Canns was seen at the VAMC's pulmonary clinic. (R. 357) Michael Goldman, a medical student, made notes from this visit which indicate that Canns complained of fatigue going back to October 2002. (Id.) Canns stated that he slept eight hours each night without awakening and that he felt "fatigued and must nap" daily from about 5:00 p.m. to 7:00 p.m. (Id.) He also complained of feeling lethargic and falling asleep while reading, watching television and being on the bus. (Id.) Canns also reported "decreased exercise tolerance." (Id.) Canns was advised to avoid daytime sleep and was referred for pulmonary function testing. (R. 359) Dr. Steven Jacoby added notes after Canns's August 28 visit, indicating that Canns had good exercise tolerance and "walks briskly." (Id.) Dr. Jacoby noted that he could not identify the source of Canns's fatigue but ordered pulmonary testing in light of Canns's history of smoking. (Id.)

On September 25, 2003, Canns returned to the VAMC to see Dr. Pearlman. (R. 346) Canns stated that he continued to feel "exhausted." (Id.) Dr. Pearlman noted that Canns had not suffered a recurrence of his cancer, though his continuing fatigue was "concerning." (R. 347) Dr. Pearlman also advised that Canns supplement his diet with ferrous gluconate to increase his iron levels. (R. 348) Canns advised that he preferred to eat iron rich foods than take the supplement. (Id.)

On September 29, 2003, Dr. Stacy Spivak prescribed physical therapy two times a week for one month in response to Canns's reported soreness of the right foot and "pronounced" difficulties negotiating stairs.  (R. 343-45)

At this point, the Department of Veterans Affairs found that Canns was entitled to a nonservice-connected pension as a result of disabilities stemming from his right ankle condition, onychomycosis,[2] status-post resection of the left kidney, and recurrent hemorrhoids. (R. 209-11)

On October 21, 2003, Canns was seen for a follow-up in the VAMC Urology Clinic.  (R. 333-34)  He reported "persistent fatigue" but stated that it was "getting better." (R. 334)  Dr. Joshua Fiske noted that Canns had not suffered any recurrence of cancer and that his fatigue was improving.  (R. 334-35)

Dr. Pearlman saw Canns for a follow-up on January 12, 2004.  Canns reported feeling exhausted.  (R. 314)  Nevertheless, Dr. Pearlman reported that his fatigue was much improved.  (R. 316)

On January 14, 2004, Canns saw Dr. Jonah Green.  (R. 311)  Dr. Green's notes from that visit indicate that Canns reported that physical therapy helped to alleviate the weakness of his knees, but Canns continued to complain of decreased range of motion in the right ankle and tightness of the right ankle.  (Id.)  Canns also indicated that his strength was "significantly improved."  (R. 314)  Dr. Phillip Poulos, who made additional notes on this visit, indicated that he found Canns "in no apparent distress."  (R. 314)  Canns was advised to continue physical therapy.  (R. 313)

---

[2] Onychomycosis is defined as an infection of the nails caused by infection with ringworm, bacteria or other fungi.  Dorland's Illustrated Medical Dictionary 1342, 1955-56 (31st ed. 2007)

Dr. David Adin examined Canns's right ankle on April 14, 2004.  (R. 307)   Dr. Adin noted that Canns was "able to ambulate many blocks without stopping from right ankle pain" and that Canns did not feel the pain with his shoes on, regardless of ambulation.  (R. 307-08)  Dr. Adin recommended continued physical therapy.  (R. 308)

Canns returned to the VAMC to see Dr. Pearlman on May 25, 2004.  (R. 305) Canns reported that his energy level was much improved and that he was working as an auxiliary policeman three times a week.  (Id.)  Dr. Pearlman concluded that Canns's fatigue was "much improved" and noted that he was receiving physical therapy for his right ankle pain.  (R. 306)

On July 1, 2004, Canns saw nurse practitioner Fern Serrell, who noted that Canns's fatigue was "improving" and that he was "running and exercising and feels great."  (R. 294-95)

Canns returned to the VMAC on November 17, 2004 with complaints of lower back pain that radiated down his right leg and increased with rest.  (R. 294)  The pain reportedly decreased after he walked or stretched.  (Id.)  Canns declined non-steroidal anti-inflammatory drugs.  (Id.)  He was referred to a neurologist for a consultation.  (Id.)  When Canns was seen by a neurologist on December 1, 2004, he reported some improvement in his lower back pain and was diagnosed with likely muscle spasms.  (R. 292)  The neurologist noted that Canns had "full strength" and that his reflexes were "intact."  (Id.)

On February 9, 2005, Canns was seen again in the VAMC pulmonary clinic after a mass was discovered on a chest x-ray.  (R. 283)  On this visit to the VAMC, Canns reported "some increased fatigue."  (Id.)  On March, 23, 2005, Canns underwent surgery to remove the mass.  (R. 252)  He was discharged three days later and advised not to lift over ten pounds or push or pull for two months.  (R. 226-27)

On March 31, 2005, Canns was seen in the VAMC Emergency Room with complaints of pain in his left arm.  (R. 222)  Examination revealed tenderness to palpitation of the left axilla, pain with forward flexion to seventy-five degrees and abduction to sixty degrees with pain.  (R. 224)  He was diagnosed with left axillary pain and limited motion of unclear etiology.  (Id.)

On July 24, 2005, Dr. Pearlman evaluated Canns.  (R. 218)  Dr. Pearlman concluded that Canns's "frozen shoulder" had resolved itself.  (R. 220)  Dr. Pearlman also noted that Canns's right ankle pain was "[e]ssentially resolved."  (Id.)

On January 26, 2007, Canns visited the VAMC Walk-In Clinic complaining of intermittent weakness and instability in his left knee.  (R. 526)  Canns reported "minimal pain" and indicated the problem was "most noticeable when going up stairs or running after [a] bus or [a] train."  (Id.)  He was diagnosed with probable arthritis.  (Id.)  On February 1, 2007, Canns was evaluated by Dr. Assaf Gordon.  (R. 522)  Dr. Gordon reported "maltracking" of the patella on extension, tenderness to palpitation just lateral to the patella.  (R. 524)  Canns could squat to full range with pain at the end of the range.  (Id.)  Dr. Gordon fitted Canns with a knee brace and recommended physical therapy twice a week for four months.  (R. 525)

On March 17, 2008, Canns was seen by nurse practitioner Serrell.  (R. 632)  He complained of dizziness with positional changes.  (R. 633)  Serrell noted that Canns had not seen his primary care physician, Dr. Pearlman, for approximately two years and urged him to schedule a follow up visit with her.  (R. 632)  On July 10, 2008, Canns saw Dr. Pearlman and reported dizziness.  (R. 669-72)  Dr. Pearlman ordered a CT scan of Canns's head, which was negative.  (R. 644, 672)  Canns was seen by Dr. Mausumi Khaund, a neurologist, on August 27, 2008.  (R. 663)  Canns complained of vertigo and hearing loss and occasional tinnitus in his left

ear.  (Id.)  Canns also complained of fatigue and occasional double vision.  (Id.)  Dr. Khaund

prescribed medication for Canns's vertigo and advised him to "change positions slowly."  (R.

663-64)

Canns saw Dr. Pearlman on September 2, 2008.  (R. 658)  Dr. Pearlman noted

that Canns had suffered no recurrence of cancer, that his "frozen shoulder" had resolved, and that

his right ankle pain had "essentially resolved."  (R. 658-662)  Dr. Pearlman also indicated that

Canns had not taken the medication prescribed for his vertigo because of concerns about

drowsiness but that he had not been bothered by the vertigo after "behavioral modification."  (R.

661)

**B.   Physicians' Reports**

On July 14, 2006, Dr. Pearlman completed a "Multiple Impairment

Questionnaire" concerning Canns.  (R. 497-504)  Dr. Pearlman reported that she began treating

Canns on October 15, 2002, and had seen him approximately every six months since then.  (R.

497)  Dr. Pearlman diagnosed Canns with "renal cell carcinoma (left kidney), thymoma,[3]

arthritis, and colonic polyps."  (Id.)  She went on to note that Canns suffered no symptoms

related to his cancer and experienced "moderate" daily pain in his right foot as a result of

arthritis.  (R. 498)  In response to a question about whether the patient's symptoms and

functional limitations were "reasonably consistent" with his physical impairments, Dr. Pearlman

answered that she was "uncertain" and that Canns's symptoms were only "possibly related" to a

physical impairment.  (Id.)

In assessing Canns's pain, Dr. Pearlman rated it a seven on a ten-point scale; she

rated Canns's fatigue a ten on a ten-point scale.  (R. 499)  Dr. Pearlman opined that Canns was

---

[3]  Thymoma  is defined as "a tumor derived from the epithelial or lymphoid elements of the
thymus."  Dorland's Illustrated Medical Dictionary 1950 (31st ed. 2007).

able to sit for four hours and to stand/walk for two hours as part of a "competitive five day a week work environment" requiring eight-hour work days.  (R. 499)  Dr. Pearlman noted that Canns needed to get up and move around for five to ten minutes every 30 minutes when sitting "to stay awake."  (Id.)

Dr. Pearlman opined that Canns would be able to lift between 20 and 50 pounds "frequently" and more than 50 pounds "occasionally."  (R. 500)  She also indicated that Canns would be able to carry between 10 and 20 pounds "frequently" and between 20 and 50 pounds "occasionally."  (Id.)  She noted that Canns did not have significant limitations in doing repetitive reaching, handling, fingering or lifting and would suffer no such limitations in a competitive work environment.  (R. 500-01)  Dr. Pearlman also stated that Canns would have no problem keeping his neck in a constant position in order to look at a computer screen or a desk. (R. 501)

Dr. Pearlman's report indicated that Canns's symptoms would worsen if he was placed in a competitive work environment and that he would "constantly" have trouble with attention and concentration.  (R. 501-02)  However, Dr. Pearlman noted that Canns could tolerate "moderate stress" related to work.  (R. 502)  She estimated that Canns would need a one-hour break once a day and might be absent two to three times a month.  (R. 502-03)  Dr. Pearlman advised that Canns should avoid work environments involving kneeling, dust, and heights.  (R. 503)

Dr. Pearlman made clear that she did "not have a medical explanation for the degree of impairment/fatigue" Canns suffered. (Id.)

Dr. David Guttman, a consultative medical examiner, evaluated Canns on November 13, 2006.  (R. 505-08)  Canns complained of soreness in his right foot and ankle

following his 1993 fracture, noting that the pain was "better with Advil and worse with walking." (R. 505) Canns also complained of suffering chronic fatigue since 2002, occasional muscle spasms since 2004, diarrhea every other day since 2003, and mild emphysema since 2002. (R. 505) Dr. Guttman observed that Canns "appeared to be in no acute distress," had a normal gait and could "walk on heels and toes without difficulty." (R. 506) Canns "[u]sed no assistive devices" in walking, "[n]eeded no help changing for [the] exam or getting on and off [the] exam table" and was "[a]ble to rise from [the] chair without difficulty." (Id.) Canns also had full range of motion in his shoulders, elbows, forearms, wrists, hips, knees and ankles and full strength in his arms and legs. (R. 507) Dr. Guttman determined that Canns's prognosis was "good" and that he had "no restrictions" on his work. (Id.)

III.   **THE APRIL 6, 2007 HEARING BEFORE THE ALJ**

A.   **Canns's Testimony**

At the April 6, 2007 hearing before the ALJ, Canns testified about his medical history. (R. 697-709) Canns stated that he had "problems mainly of fatigue," meaning that he had to sleep for "a couple of hours" after being awake "about ten hours." (R. 697)

Canns also reported suffering from arthritis in his right foot, limiting his walking to "a couple of city blocks." (R. 697-98) Canns indicated that his arthritis was "sporadic." (R. 698, 717) Canns also testified that the pain in his right knee had "gotten better." (R. 717) Canns further stated that he was "a bit clumsy" and suffered "falls" a few times a week. (R. 706) He testified that he could stand up for 30 minutes and could sit still for "a couple of hours." (Id.) Canns believed he could lift 20 pounds, pick up a piece of paper from the floor and climb a flight of stairs, though he indicated he would have trouble if he had to "jump up and down," as he had

while working as an administrative assistant.  (R. 699)  Canns testified that he took only Advil to treat his arthritis.  (R. 700)

Canns also reported suffering from frequent diarrhea and stated that when it occurred he had to use a bathroom "every hour or so" or "two to three times" per day.  (R. 707-09)  Canns indicated that he had not discussed this ailment with his treating physicians.  (R. 717-19, 721)

**B.**    **Testimony of Medical Expert Dr. Brad Rothkopf**

Dr. Brad Rothkopf, a practicing physician board-certified in internal medicine and cardiology, testified at the hearing.  (R. 710-11)  Dr. Rothkopf testified that he had reviewed Canns's medical records in preparation for the hearing.  (R. 712-13)

Based on Canns's medical records, Dr. Rothkopf "didn't see any medical reason that he should be exhausted."  Dr. Rothkopf expressed a desire to further review the records, however.  (R. 725)  He also noted inconsistencies between the notes of treating physicians with regard to Canns's respiratory function and ability to exercise and Canns's claims of fatigue in walking.  (R. 727)  Dr. Rothkopf testified that based on the record, Canns could do light work. (R. 729)

Dr. Rothkopf noted that Dr. Pearlman's report on Canns's impairments was "reasonably consistent" with the medical records and with Dr. Guttman's report.  (R. 732)

**C.**    **Testimony of Vocational Expert Beth Kelly**

Beth Kelly, a vocational expert, also testified at the hearing.  (R. 735-48)  Kelly testified that she was licensed in Pennsylvania and New Jersey as a rehabilitation counselor and had served as a vocational expert for the Social Security Administration since 1985.  (R. 735) Kelly testified that Canns's work as a computer programmer was "sedentary skilled work."  (R.

738)  She indicated that a computer programmer would be "sitting most of the day."  (R. 740)

Kelly stated that Canns's work as a computer instructor was "light skilled work."  (Id.)  Kelly

testified that Canns's job as an administrative assistant would qualify as sedentary skilled work

based on the types of tasks he was required to complete. (R. 739-40)

　　　　　In response to hypothetical questions from Canns's counsel, Kelly testified that an

individual who missed work two to three days per month would be unable to maintain

competitive employment.  (R. 747)  She also reported that an individual who could sit for four

hours per day and could stand or walk for no more than two hours per day would not be able to

maintain competitive employment.  (Id.)  She also testified that an individual who required rest

periods of five to ten minutes every half-hour while working would not be able to maintain

competitive employment.  (R. 747-48)

## IV.　　　THE ALJ'S DECISION

　　　　　On April 16, 2007, the ALJ issued a decision denying Canns's application for

SSD and SSI benefits.  (R. 19-28)  The ALJ found that Canns "has not engaged in substantial

gainful activity since December 1, 2002" and that Canns suffers from the following severe

impairments:  a history of renal cell cancer with left nephrectomy in 2002; emphysema; and

status-post right ankle fracture with residual arthritic pain.  (R. 21-22)  After determining that

Canns does not suffer an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (R. 22),

the ALJ considered Canns's residual functional capacity to perform work in light of his

impairments.  (R. 22-27)  After considering Canns's testimony and the medical evidence in the

record, the ALJ found Canns's "statements concerning the intensity, persistence and limiting

effects" of his symptoms "not entirely credible."  (R. 24)  The ALJ further concluded that he

could not fully credit Dr. Pearlman's statements that Canns "cannot sit more than 4 hours in an

8-hour day" and "could not work a full 8-hour day." (R. 25-26) In light of these conclusions, and the evidence the ALJ gleaned from Canns's medical records, the report of Dr. Guttman and the testimony of Dr. Rothkopf, the ALJ found that Canns has the residual functional capacity "to perform a full range of work at the sedentary exertional level and a limited range of work at the light exertional level" and thus that Canns "is capable of performing past relevant work as a programmer." (R. 22-27) Accordingly, Canns's application for benefits was denied. (R. 28)

## DISCUSSION

Both Canns and the Commissioner have moved for judgment on the pleadings. Canns argues that the ALJ's decision should be reversed and remanded for calculation and awarding of benefits – or, in the alternative, reversed and remanded for a new hearing – as a result of the ALJ's failure to (1) properly credit the views of Canns's treating physician, and (2) properly evaluate Canns's credibility. The Commissioner argues that the ALJ's decision should be affirmed because it adheres to the law and is supported by substantial evidence.

"'A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error.'" Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see also 42 U.S.C § 405(g).

"Failure to apply the correct legal standards is grounds for reversal." Townley v. Heckler, 748 F.2d 109, 112 (2d Cir.1984). "If the Commissioner failed to apply the correct legal standard in making a determination, the reviewing court must not defer to the Commissioner's decision." Johnson v. Astrue, 563 F. Supp. 2d 444, 453 (S.D.N.Y 2008).

"Substantial evidence means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Burgess, 537 F.3d at 127 (quoting Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004)).

"[T]he findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. . . ."  Santiago v. Astrue, No. 06 Civ. 7860 (CLC), 2007 WL 1982747, at * 3 (S.D.N.Y. July 3, 2007) (citing Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir.1995)).  "If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson, 563 F. Supp. 2d at 454 (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454; see also Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (noting that the role of the appellate court, like the district court, is to conduct a "plenary review of the administrative record" and not "to determine de novo whether [the claimant] is disabled").

## I.      THE ALJ'S DETERMINATION THAT CANNS IS NOT DISABLED IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS LEGALLY CORRECT

A claimant is considered disabled under the Social Security Act (the "Act") if he or she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  "A 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The claimant's impairments must be of

> such severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

42 U.S.C. § 423(d)(2)(A).  Under the Act, "'work which exists in the national economy' means

work which exists in significant numbers either in the region where [the claimant] lives or in

several regions of the country."  Id.

 The Commissioner is required to follow a five-step process in evaluating

disability claims.  See 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has outlined the

required analysis as follows:

> "First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.  Where the
> claimant is not, the Commissioner next considers whether the
> claimant has a 'severe impairment' that significantly limits her
> physical or mental ability to do basic work activities.  If the
> claimant suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment
> that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. . . . Assuming
> the claimant does not have a listed impairment, the fourth inquiry
> is whether, despite the claimant's severe impairment, she has the
> residual functional capacity to perform her past work.  Finally, if
> the claimant is unable to perform her past work, the burden then
> shifts to the Commissioner to determine whether there is other
> work which the claimant could perform."

Jasinski v. Barnhart, 341 F.3d 182, 183-184 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d

770, 774 (2d Cir. 1999)); see also 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the

burden of proof as to steps one through four; the Commissioner bears the burden of proof as to

step five.  Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004).

 Here, the ALJ first concluded that Canns "has not engaged in substantial gainful

activity since December 1, 2002."  (R. 21)  With regard to step two, the ALJ determined that

Canns suffers from the following severe impairments:  a history of renal cell cancer with left nephrectomy in 2002; emphysema; and status-post right ankle fracture with residual arthritic pain.  (R. 21-22)  The ALJ next determined that Canns does not suffer an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  (R. 22)  Canns does not challenge these findings.

What is disputed is the ALJ's conclusion that Canns has the residual functional capacity "to perform a full range of work at the sedentary exertional level and a limited range of work at the light exertional level" and thus that Canns "is capable of performing past relevant work as a programmer."  (R. 22-27)  Canns argues that the ALJ's decision is legally erroneous and not based on substantial evidence.  He bears the burden of proof in establishing these errors. See Barnhart, 388 F.3d at 383.

### A.      Residual Functional Capacity to Perform Past Work

Because the ALJ concluded that Canns did not suffer from a listed impairment, he proceeded to evaluate whether Canns retains the residual functional capacity to perform his past work.  See Jasinski, 341 F.3d at 183-84; 20 C.F.R. § 404.1520(e).

The ALJ concluded that Canns "has the [residual functional capacity] to perform work at the sedentary exertional levels and a limited range of work at the light exertional level . . . ."  (R. 22)

Consistent with the methodology set forth in the Code of Federal Regulations, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence. . . ."  (R. 23) (citing 20 C.F.R. §§ 404.1529, 416.929(a)).  The ALJ first assessed "whether there is an underlying medically determinable physical or mental impairment – i.e., an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could

reasonably be expected to produce the pain or other symptoms alleged."  (R. 23)  The ALJ next determined "the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit [Canns's] ability to do basic work activities."  (Id.)

### 1.   The ALJ Applied the Proper Legal Standards in Considering Canns's Credibility and His <u>Determination is Supported by Substantial Evidence</u>

In evaluating subjective evidence, such as a complaint of fatigue, the ALJ is permitted to make credibility findings concerning a claimant's statements about his symptoms and to consider objective evidence, the claimant's demeanor, and other indicia of credibility. <u>See</u> <u>Tejada v. Apfel</u>, 167 F.3d 770, 776 (2d Cir. 1999) (citing <u>Pascariello v. Heckler</u>, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985) (noting that after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, an ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment)).

However, "[c]onclusory findings of a lack of credibility will not suffice; rather, an ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'"  <u>Rojas v. Astrue</u>, No. 09 Civ. 6698 (DLC), 2010 WL 1047626, at *5 (S.D.N.Y. Mar. 22, 2010) (quoting SSR 96-7p, 61 Fed. Reg. 34,481, 34,484 (July 2, 1996)).

"Deference should be accorded the ALJ's determination because he heard plaintiff's testimony and observed his demeanor."  <u>Gernavage v. Shalala</u>, 882 F. Supp. 1413, 1419 n. 6 (S.D.N.Y. 1995) (citing <u>Mejias v. Social Sec. Admin.</u>, 445 F. Supp. 741, 744 (S.D.N.Y. 1978); <u>Wrennick v. Sec'y of Health, Educ. and Welfare</u>, 441 F. Supp. 482, 485-86 (S.D.N.Y. 1977)).

"It is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal quotations and citations omitted).  Thus, a determination of credibility will only be set aside if it is not set forth "with sufficient specificity to enable [a reviewing court] to decide whether [it] is supported by substantial evidence."  Rojas, 2010 WL 1047626, at *6 (quoting Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.1984)).

"[A]n ALJ 'must' consider seven factors in assessing the credibility of an individual's statements about symptoms and their effects."  Wright v. Astrue, No. 06-CV-6014 (FB), 2008 WL 620733, at *3 (E.D.N.Y. March 5, 2008) (internal citation omitted).  These seven factors include:  "(i) [claimant's] daily activities; (ii) the location, duration, frequency, and intensity of [claimant's] pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication [claimant] takes or [has] taken to alleviate [] pain or other symptoms; (v) treatment, other than medication, [claimant] receive[s] or [has] received for relief of [] pain or other symptoms; (vi) any measures [claimant] uses or [has] used to relieve [] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning [] functional limitations and restrictions due to pain or other symptoms."  20 C.F.R. 416.929(c)(3).

Here, the ALJ found that Canns's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [Canns's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (R. 24)

Canns argues that the ALJ impermissibly considered only one of the seven relevant factors in making this determination:  Canns's daily activities.  (Pltf. Br. 18-19)  It is correct that the ALJ noted that "[t]he extent of claimant's daily activities is not indicative of total disability.  He is able to cook and shop for himself and to use public transportation to get to and from medical appointments."  (R. 26)  However, the ALJ also discussed evidence concerning the other factors set forth in the applicable regulation in making his determination as to Canns's credibility.  (R. 24-27)

The ALJ placed particular weight on the second factor:  the location, duration, frequency, and intensity of Canns's symptoms.  The ALJ based his credibility determination, in part, on the fact that Canns's medical records reflect long gaps between complaints of fatigue and that his physicians' treatment notes do not set forth recent complaints of fatigue.  (R. 25-26)  The ALJ pointed to one of several instances in the record in which Canns indicated that his fatigue was improving and to Canns's comment that his exhaustion was "more psychological than physical."  (R. 24)  The ALJ also relied on the consultative examination, which found that Canns had "normal vital signs, clear lungs, regular heart sounds, normal abdominal sounds, full range of motion. . . . as well as normal muscle strength. . . ."  (R. 24-25)

The record provides substantial support for the ALJ's conclusion that Canns's claims of fatigue and incapacitating pain are not credible.  Canns's medical records contain multiple notations to the effect that his fatigue is improving.  (R. 294-95, 305-06, 316, 334-35, 375)  On one occasion in July 2004 – nearly two years after the onset of his alleged disability – Canns told doctors that he was feeling "great" and was able to exercise, run and volunteer as an auxiliary police officer.  (R. 294-95)  Notes from several medical examinations indicate that

Canns has full muscle strength and walks without assistance.  (R. 292, 294, 308, 311-12, 344, 506, 526)

The ALJ also noted that Canns "takes no prescription medication for pain, and that he takes over-the-counter analgesics (Advil) sporadically for pain" and receives physical therapy for his ankle.  (R. 24)  In considering this evidence, the ALJ addressed the fourth and fifth factors:  the type, dosage, effectiveness, and side effects of Canns's medications and treatment, other than medication, Canns receives.  See 20 C.F.R. 416.929(c)(3).

The ALJ also considered the remaining factors, which relate to what precipitates and aggravates Canns's symptoms, what measures Canns takes to relieve his symptoms, and other factors concerning Canns's functional limitations.  See 20 C.F.R. 416.929(c)(3).  The ALJ acknowledged that Canns's ankle pain is aggravated by moving "up and down out of his chair frequently during the day."  (R. 24)  The ALJ also discussed Canns's claim that he "needs to rest and cannot sustain a full day of activity, even sedentary activity, without resting."  (R. 24)  The ALJ took into account Canns's functional limitations – for example, limits in the amount of time he can stand and walk around or the weights he can lift – in calculating Canns's residual functional capacity to work.  (R. 26) ("While the record supports a finding that claimant has some limitations due to his conditions (I have factored these limitations into his RFC), there is no support in the record to conclude that claimant is unable to perform sedentary exertional work. . . .").

Ultimately, the ALJ properly weighed the evidence – including the evidence relevant to all of the factors listed in the regulation – and concluded that Canns's complaint about the severity and intensity of his pain and fatigue were not credible.  In so doing, the ALJ

followed the applicable legal standards and his conclusion was supported by substantial evidence in the record.

### 2.  The ALJ Properly Considered the Medical Opinion Evidence

In determining whether Canns had the residual functional capacity to perform past work, the ALJ considered the opinions of Canns's treating physician – Dr. Pearlman – as well as the consultative examiner and the medical expert who testified at the hearing.

"With respect to the nature and severity of a claimant's impairment(s) . . . the SSA recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotations and citations omitted).  In relevant part, the statute holds that if the Commission "finds that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commission] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

However, "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issue[s] opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (internal citation omitted); accord 20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion is not given controlling weight, the proper weight accorded depends upon:  "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's

consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)). "Genuine conflicts in the medical evidence are for the Commissioner to resolve." Venio v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).

Here, the ALJ did "not give full weight" to Dr. Pearlman's assessment that Canns cannot work a full eight hour day. (R. 26) The ALJ explained that Dr. Pearlman's conclusion "is inconsistent with treatment notes, and with the assessments of consulting physician Dr. Guttman and the medical expert present at the hearing Dr. Rothkopf." (R. 26) Further, the ALJ found that Dr. Pearlman relied on Canns's complaints of fatigue in reaching her conclusion, despite the fact "that the fatigue is not medically established, in view of the fact that it is not mentioned in any of the treatment notes of Dr. Pearlman" and "is not medically corroborated." (Id.)

Canns argues that the ALJ's reasoning as to Dr. Pearlman's assessment of Canns's functional capacity is not supported by the evidence in the record and did not accord sufficient weight to Dr. Pearlman's views. (Pltf. Br. 15-16)

Canns ignores the fact that the statute requires that a treating physician's "opinion on the issue(s) of the nature and severity of [the] impairment [be] well-supported by medically acceptable clinical and laboratory diagnostic techniques. . . ." See 20 C.F.R. § 404.1527 (emphasis added). Dr. Pearlman acknowledged that she does "not have a medical explanation for the degree of impairment/fatigue" Canns allegedly suffers.[4] (R. 503) Dr. Jacoby, a

---

[4] Canns claims that the ALJ was legally obligated to "contact Dr. Pearlman for clarification" in light of the lack of a medical explanation for Canns's fatigue. (Pltf. Br. 16) Certainly, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a

pulmonologist who saw Canns in 2003 also noted that he did not know the etiology of Canns's

fatigue.  (R. 359)  Moreover, the record contains no medical evidence supporting Canns's claims

about his fatigue beyond the subjective complaints he made to treating physicians.  Even those

subjective complaints are often accompanied by reports that his level of fatigue is improving.

See R. 294-95, 305-06, 316, 334-35, 375.

On appeal, Canns points to nothing in the record that provides objective support

for his claims of fatigue.  He argues that Dr. Pearlman indicated that he was not a "malingerer"

and that Dr. Guttman did not find that he was exaggerating his symptoms (Pltf. Br. 15-16), but

these statements do not constitute objective medical evidence sufficient to provide a basis for Dr.

Pearlman's conclusion that Canns is incapable of working a full day.

Furthermore, the ALJ weighed the conflicting opinions of the consultative

examiner, Dr. Guttman, and of the medical expert, Dr. Rothkopf, in according limited weight to

Dr. Pearlman's assessment of Canns's functional capacity.  (R. 26)  After examining Canns, Dr.

Guttman noted that he "appeared to be in no acute distress," and could walk, get on and off the

exam table and rise from a chair without assistance or apparent difficulty.  (R. 506) Canns also

had full range of motion in his shoulders, elbows, forearms, wrists, hips, knees and ankles and

full strength in his arms and legs.  (R. 507)   Dr. Guttman determined that Canns's prognosis

was "good" and that he had "no restrictions" on his work.  (Id.)

---

'complete medical history,' the ALJ is under no obligation to seek additional information in
advance of rejecting a benefits claim."  Id. at 79 n. 5 (quoting Perez v. Chater, 77 F.3d 41, 48 (2d
Cir. 1996)).  Here, the ALJ had before him all of Canns's medical records from the VAMC,
including treatment notes covering years of Canns's medical history and diagnostic and
laboratory test results.  The ALJ also gave Canns's counsel an opportunity to supplement the
record by citing to instances in which Canns complained of fatigue.  (R. 27)  Canns's counsel
identified six such instances, which the ALJ considered.  (Id.)  Because there were "no obvious
gaps in the administrative record" before the ALJ, he had no obligation to develop the record
further.  See Rosa, 168 F.3d at 79 n. 5.

The ALJ also noted that Dr. Pearlman, Dr. Guttman, and Dr. Rothkopf agree that Canns could at least "lift and carry up to 20 pounds occasionally, [which] brings his functional capacity into a limited range of light work."  (R. 26, 500, 507, 728-29).

Canns contends that the ALJ improperly relied on the testimony of Dr. Rothkopf.[5] (Pltf. Br. 16-18)  Canns argues that it is "questionable" whether Dr. Rothkopf conducted a sufficient review of Canns's medical records, given that he reviewed those records for only forty minutes prior to the hearing.  (Pltf. Br. 17)  Canns's counsel did not object to Dr. Rothkopf's testimony at the hearing, however, and on appeal Canns fails to point to any statement that reflects a lack of information beyond Dr. Rothkopf's note that he could not definitively answer certain questions without looking back to the medical record.  (Id.)

In arguing that the ALJ's opinion should be reversed because of improper reliance on Dr. Rothkopf, Canns relies upon Burgess v. Astrue, 537 F.3d 117 (2d Cir. 2008).  Burgess, however, is inapposite.  There, the Second Circuit dismissed the testimony of a medical expert who "plainly had not read" MRI results crucial to claimant's disability.  Id. at 132.  Here, as Canns acknowledges, Dr. Rothkopf took time before the hearing – even if that time was limited – to review the medical records and was careful to qualify his answers as consistent with the medical records he had reviewed.  (R. 712-13, 732)  Indeed, the ALJ found Dr. Rothkopf's testimony "logical and consistent with the overall record and generally consistent with the treatment notes (if not the medical source opinion of Dr. Pearlman)."  (R. 26)  In sum, the ALJ properly considered Dr. Rothkopf's testimony in evaluating the treating physician's assessment. See Halloran, 362 F.3d at 32.

---

[5]  Canns points out that the ALJ stated that he "considered the opinions and findings of the State agency medical consultants," though no such opinions are included in the record.  (Pltf. Br. 17) While this is an error, the context makes clear that the ALJ was referring to Dr. Guttman and Dr. Rothkopf.  See R. 26.

**B.**      <u>**Canns's Relevant Past Work**</u>

After assessing a claimant's residual functional capacity, an ALJ is required to determine whether he is able "to perform [his] past work."  <u>See</u> <u>Jasinski</u>, 341 F.3d at 183-84.  In order to be relevant, historical work must have been performed within the past fifteen years, lasted long enough for the claimant to learn to do the work, and constitute "substantial gainful activity."  20 C.F.R. § 416.965(a).  Canns's past relevant work includes employment as a computer programmer, a computer instructor, and an administrative assistant.  (R. 99, 107-09) The vocational expert testified that employment as a computer programmer is "sedentary skilled work" involving "sitting most of the day," (R. 738, 740) and employment as a computer instructor is "light skilled work."  (R. 740)  Employment as an administrative assistant would qualify as sedentary skilled work. (R. 739-40)

The ALJ's determination that Canns "is able to perform" his past relevant work is supported by substantial evidence.  (R. 27)  The ALJ noted that Canns "certainly could perform the programmer job, which does not involve much need to get up and down.  Even if he could not perform the secretarial/administrative assistant job as he actually performed it, I would presume (although I did not specifically ask the question of the [Vocational Expert]) that there are some if not many secretarial jobs where the employee would be sitting most of the day." (<u>Id.</u>)

Because Canns's residual functional capacity permits him to undertake his past relevant work, he is not disabled according to the standards set forth by the Social Security Administration.  <u>See</u> 20 C.F.R. §§ 404.1520(f), 416.920(f).

## CONCLUSION

For the reasons stated above, Canns's motion for judgment on the pleadings is DENIED, and the Commissioner's motion for judgment on the pleadings is GRANTED. The Clerk of the Court is directed to terminate the following motions: Docket Nos. 8, 12. The Clerk of the Court is further directed to close this case.

Dated: New York, New York
       July 9, 2010

SO ORDERED.

Paul G. Gardephe
United States District Judge

27